## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF PUERTO RICO

| | |
|---|---|
| **IN RE:** | **Case No. 19-06327 ESL** |
| **FERNANDO LUIS VILLAMIL-WISCOVITCH dba FERNANDO VILLAMIL WISCOVITCH, MD** | **Chapter 11** |
| **xxx-xx-9164** | RECEIVED AND FILED - SJ-PR<br>USBC '23 JUN 12 PM 1:39 |

## OBJECTION TO INCLUSION AND DISCHARGEABILITY

**TO THE HONORABLE COURT:**

    **COMES NOW** Mr. Juan Carlos Rivera Pedrogo, through the undersigned counsel, and very respectfully states and prays as follows:

### I.     Introduction

    On May 30, 2023, the debtor filed an Amended Schedule E/F for the sole purpose of including Mr. Juan Carlos Rivera Pedrogo (Rivera) as a creditor (DE #206). As shown, Rivera filed a medical malpractice lawsuit against the debtor, Case 3:22-CV-1039 (CVR), related to a pre-petition claim, alleging damages in the amount of $3,100,000.00.[1] Until the recent Schedule E/F amendment, Rivera remained an excluded creditor in the debtor's bankruptcy process. He never got notice of its filing, nor had the opportunity to be heard as to the confirmation of the Reorganization Plan, and never knew about the Final Decree

---

[1] According to the Amended Schedule E/F, Rivera's claim is contingent, unliquidated, and disputed.

nor the closing of the case on September 15, 2021, without entry of a discharge order. The appearing party posits that the debtor's failure to disclose relevant information regarding his claim is an indication of bad faith. Further, Rivera's intentional exclusion and lack of notice of the bankruptcy proceedings that could affect his interests violate due process. Finally, Rivera posits that the debtor's behavior is an attempt to manipulate both proceedings and abuse the protections of the Bankruptcy Code.

## II.   Factual and procedural background

A spine surgeon, debtor Fernando Luis Villamil Wiscovitch (the debtor) operated on Rivera Pedrogo (Rivera) on November 6, 2018. Bringing upon him some unexpected sequelae, Rivera began requesting copies of his medical records, which he finally got in August 2019. On October 28, 2019, Rivera filed a first medical malpractice complaint to toll the one-year statute of limitations, suing the defendant at the Court of First Instance, San Juan Part. The summons and the copy of the complaint were not served to the debtor.

Defendant filed this Ch. 11 petition on October 30, 2019 (DE #1), two short days after the first malpractice complaint was filed against him before the local Court. The bankruptcy petition was filed without the complete Schedules and his financial circumstances. Following two extensions of time to file Schedules and Statements, on November 22, 2019, the debtor filed the completed Schedules and Statements (DE #21-23). The defendant-debtor later filed Amended Schedules and Statements on January 31, 2020. (DE #40-46).

Rivera voluntarily dismissed the local complaint without prejudice, on March 21, 2020. Thus, the one-year statute of limitation period to file another suit restarted on that date.

On August 28, 2020, the defendant-debtor filed a Reorganization Plan. (DE #121).

Having interrupted the applicable statute of limitations by an on-time filing, within one year of its voluntary dismissal, Rivera mailed via certified mail an extrajudicial claim. On February 23, 2021, the debtor received the certified letter (Exhibit 1), thus a new one-year term to file a lawsuit re-started.

A Supplemented Plan of Reorganization was filed by the debtor (DE #157) and on May 18, 2021, was confirmed by this court. (DE-171). A Final Decree was subsequently entered on September 15, 2021, establishing that the confirmed Ch. 11 Plan was *substantially consummated, and the estate closed without an entry to discharge*. (DE #194).

Rivera was intentionally omitted as a creditor in the debtor's bankruptcy proceedings. In the meantime, Rivera filed a complaint on January 22, 2022 (Exhibit 2). A Notice of a Lawsuit and Request to Waive Service of Summons was sent thereafter by certified mail, which the defendant received through his agent on January 31, 2022 (Exhibit 3). To take no chances, the complaint and the summons were also personally served upon the defendant on February 18, 2022 (Exhibit 4).

On March 28, 2022, the debtor filed his Answer to the Complaint (Exhibit 5). A simple review shows that no mention whatsoever was made in his Answer to the Complaint of his 2019 bankruptcy petition, neither of Rivera's inclusion/exclusion as a creditor, nor the applicability of the automatic stay, its violation, or any bankruptcy injunction after closing the case. Most importantly, since the debtor was served with Rivera's complaint, his bankruptcy was never mentioned nor addressed by him for more than 15 months, even when he adamantly requested on January 25, 2023, the dismissal of

the lawsuit for want of jurisdiction (Exhibit 6).[2] Prompted by the defendant's motion to dismiss, and while researching for its opposition, in February 2023 Rivera became aware of the debtor's closed case of bankruptcy, where he excluded him as a creditor.

The US District Court for PR dismissed the debtor's petition to dismiss on March 21, 2023, (Exhibit 7) thus, standard discovery procedures were continued.

At the debtor's request, the current bankruptcy case was reopened on March 6, 2023 (DE #200), only to bring a lawsuit against his ex-spouse and her attorney for violating the automatic stay in an adversary proceeding filed on March 17, 2023 (23-00018 ESL).

The debtor submitted a motion on May 11, 2023, asking for the medical malpractice case to be stayed. (Exhibit 8),

To include Rivera as an omitted creditor, on May 30, 2023, the debtor then submitted a Motion to Amend Schedule E/F. (DE #206).

Following the voluntary dismissal of the adversary complaint against the attorney, the debtor, and his ex-spouse filed a Joint stipulation for dismissal of the adversary complaint, which is pending approval from this court.

On June 12, 2023, Rivera filed in the US District Court a Response in Opposition to the defendant-debtor's Motion to Stay, both of which are pending resolution.

## Legal Standard

### A.  Unlisted creditor

---

[2] Following the plaintiff's opposition, the defendant filed a Reply on March 14, 2023 (DE 58) and, still, he refrained to reveal any event in his bankruptcy case, as its motion for reopening, filed on February 8, 2023 (DE #198).

As Chapter 11 cases frequently feature a reorganization plan that might affect the rights of numerous creditors in different ways, the treatment of unlisted or unaware creditors can be complicated.  If a creditor was not mentioned, did not receive notice of the bankruptcy, and was therefore excluded in a Chapter 11 case, they might not be subject to the conditions of the confirmed plan. The general rule of due process is that parties must be given notice before their rights are compromised, and the bankruptcy context is no exception. The need for notice is emphasized in <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306 (1950), which deals with processes that may have an impact on a person's rights.

After a debtor has submitted a reorganization plan in a Chapter 11 bankruptcy, with some exceptions regarding types of claims, a creditor has the right to vote on that plan.[3] While a debtor in a Chapter 11 bankruptcy can overlook the inclusion of a creditor from the reorganization plan, it is important to note that <u>intentionally excluding</u> a creditor may have consequences. Bankruptcy laws require debtors to provide accurate and complete information about their debts and creditors. If a debtor intentionally fails to disclose a creditor, it could be viewed as an attempt to defraud the court and the creditors, which is a serious offense.[4] It is known that the purpose of bankruptcy is to provide a fresh start to debtors who are honest and transparent in their financial affairs. This policy is a

---

[3] See 11 U.S.C. § 1126(a), "[t] the holder of a claim or interest . . . may accept or reject a plan."
[4] See 18 U.S.C. §157, Bankruptcy fraud, which states that:
A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—
 (1) files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;
 (2) files a document in a proceeding under title 11; or
 (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, <u>imprisoned</u> not more than 5 years, or both. <u>See</u>, also 18 U.S. Code § 152 - Concealment of assets; false oaths and claims; bribery.

central tenet of U.S. bankruptcy law. In <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 367 (2007), quoting from <u>Grogan v. Garner</u>, 498 U.S. 279, 287 (1991), the Court referred to the "principal purpose of the Bankruptcy Code" as being to grant a 'fresh start' to the 'honest but unfortunate debtor.'

Intentionally omitting a creditor from the list of creditors during bankruptcy proceedings can compromise the fairness of the process and have grave repercussions, such as the denial of discharge or even accusations of bankruptcy fraud. In Law v. Siegel, 571 U.S. 415, 421 (2014), the court noted that the bankruptcy system is created to offer a process by which some insolvent debtors can reorganize their affairs, make peace with their creditors, and take advantage of a new opportunity in life with a clear field for future effort, unhindered by the pressure and discouragement of prior debt. This objective is undermined if debtors are not honest and transparent in their bankruptcy filings, including by intentionally failing to list certain creditors. Debtors must provide complete and accurate information in their bankruptcy filings <u>under penalty of perjury</u>, as specified in 11 U.S.C. § 521(a)(1).

The bankruptcy court typically oversees the reorganization process and ensures fairness to all parties involved. Section 1129(a)(3) notes that a court can confirm a plan if it has been "proposed in good faith and not by any means forbidden by law."[5] "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." <u>In the Matter of Little Creek Develop. Co.</u>, 779 F.2d 1068, 1071-72 (5th Cir. 1986).

---

[5] See 11 U.S.C. § 1129(a)(3).

This good-faith requirement exists (1) to prevent the "abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way" and (2) to protect "the jurisdictional integrity of the bankruptcy courts" by making the Code only available to debtors with "clean hands." *Id.* at 1072. Creditors have the right to receive notice of bankruptcy filing and participate in the case by filing a proof of claim or objecting to the debtor's reorganization plan. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and allow them to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).

A Final Decree is a formal document that signifies the closing of the bankruptcy case. The Final Decree is often issued after the completion of the administration of the case, which can include the substantial consummation of the Chapter 11 plan. As stated in the Federal Rules of Bankruptcy Procedure Rule 3022: "*After an estate is fully administered in a chapter 11 reorganization case, the court, on its own or on motion of a party in interest, shall enter a final decree closing the case.*" The exact timing can depend on various factors. Issuance of a Final Decree generally suggests that the bankruptcy court has concluded that continued control over the administration of the plan is not necessary.

Moreover, the concept of "substantial consummation" is relevant to several aspects of a Chapter 11 case. As per 11 U.S.C. § 1127(b), *a plan may not be modified if it has been substantially consummated.* Once a plan is confirmed and substantially consummated, this usually triggers the effective date of the plan, which is when the reorganized debtor begins to operate under the terms of the confirmed plan. Substantial

consummation of a plan often precedes the closing of the case and issuance of a Final Decree. As per Federal Rules of Bankruptcy Procedure Rule 3022, a bankruptcy case is typically closed after it has been "fully administered," which generally includes substantial consummation of the plan.

The act of the court's approval of the debtor's Plan of Reorganization entails some legal consequences for all interest parties in the bankruptcy proceeding. Being an estate fully administered in a Chapter 11 reorganization, the court, on its own motion or on motion of a party in interest, enters a final decree and closes the case. (See, FRBP §3022).

There is no requirement in Rule 3022 of the Federal Rules of Bankruptcy Procedure that a discharge must be granted before the entry of the Final Decree. The bankruptcy case is formally over if the Final Decree is entered and the case is closed without a discharge being obtained, but the debtor might not be released from their prior debt commitments. For any debts that have not been paid in full or discharged as part of the bankruptcy process, the debtor would still be responsible. However, those creditors who participated in the bankruptcy procedure would be subject to the conditions of the affirmed plan provided it had been properly managed (11 U.S.C. 1141(a)).

The Final Decree represents the end of the bankruptcy process, and therefore, the debtor's financial affairs are no longer under the jurisdiction of the bankruptcy court unless the case is reopened.[6]

B. Reopening of the case.

---

[6] The case can be reopened to accord relief to the debtor. See, FRBP 5010, which states: that "[A] case may be reopened on motion of the debtor or other party in interest pursuant to §350(b) of the Code." According to 11 U.S.C. 350(b), "[A] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."

According to the U.S. Bankruptcy Code (11 U.S.C. § 350(b)), a case may be reopened in the court in which such case was closed "to administer assets, to accord relief to the debtor, or for other cause." As stated in the timeline, the debtor's bankruptcy case was reopened in March 2023, for the sole purpose of permitting the debtor to file adversary proceedings against his ex-spouse, who was listed as his creditor, and her lawyer, who represented her in the divorce case against him. (DE #200). No modification of the plan was requested. Once a plan has been confirmed and substantially consummated, it usually cannot be modified. Under 11 U.S.C §1127(b), "the proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation and before substantial consummation of such plan."

C. Discussion

The Reorganization Plan of the Defendant-Debtor was approved on May 18, 2021, as was previously stated. In addition, this court issued a Final Decree on September 15, 2021, stating that the Plan was "substantially consummated" and closing the estate without an entry to discharge. Please take note that Rivera's complaint was submitted on January 22, 2022, which was four months after the estate was closed by the Final Decree.

An essential component of Chapter 11 is the finality of confirmed and substantially completed Chapter 11 plans. Without it, there would be no mechanism to enforce the expectations of all parties involved in the Chapter 11 process, which effectively results in an enforceable contract governing stakeholders' interactions with the reorganized debtor or their distribution of the bankrupt's estate proceeds.

Unraveling the terms of a court-approved plan that has been substantially consummated, to include an omitted creditor would undermine the entire process. The

existing creditors who have already approved a debtor's plan of reorganization have an interest in the orderly and predictable implementation of that plan.

The late addition of a new, significant, unliquidated, disputed, and contingent claim as the appearing party, could potentially disrupt this in several ways: (1) Changes to Plan Distributions: The US Bankruptcy Code addresses distribution to creditors in several sections. 11 U.S.C. 1123(a)(4): "...the plan shall...provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest..." The size of Rivera's medical malpractice claim could change the amounts available for distribution to other creditors under the plan. This is particularly relevant since the debtor's assets were shown to be insufficient to cover all claims in full. (2) Uncertainty and Delay:  The potential for delays and uncertainty can be inferred from the structure of the Bankruptcy Code, which prioritizes the timely resolution of bankruptcy cases. Section 1121 of the Bankruptcy Code, 11 U.S.C. § 1121, imposes time constraints on the confirmation of a reorganization plan. The litigation of a significant, disputed claim could delay the administration of the bankruptcy case and create uncertainty about the debtor's financial position. This could be particularly disruptive if it requires changes to a plan that has already been confirmed and is being implemented. (3) Administrative Expense: The possibility that late claims might increase administrative expenses can be inferred from the general principles of bankruptcy law. Section 503(b) defines "administrative expenses", which are given priority status in a bankruptcy case. Dealing with the late addition of Rivera's claim will also increase the administrative expense of the bankruptcy, which might reduce the amount available for distribution to creditors. (4) Equitable

Treatment: The Bankruptcy Code emphasizes equitable treatment of similarly situated creditors. Section 1123(a)(4), as mentioned above, requires a plan to provide the same treatment for each claim or interest of a particular class. A creditor that is added late will potentially disrupt the reorganization plan which is inconsistent with this principle.

It needs to be stated that Rivera was intentionally excluded as a creditor on the debtor's petition for bankruptcy before May 30, 2023, almost two years after the Final Decree was entered. Consequently, Rivera was not listed in the Master Address List and in the several amendments made by the debtor to Schedule "E/F Creditors Holding Unsecured Claims", with regards to disputed and unliquidated debts, as an additional party to be provided notice. Therefore, the debtor never gave notice of his filing to Rivera, who was never informed that proceedings to enforce any claims stayed by law after the filing of the aforesaid petition.  Not even a constructive knowledge of the debtor's bankruptcy proceedings could be attributed to Rivera before January 2023, 15 months following the closing of the bankruptcy case and when a legal issue was tried in the federal lawsuit in the defendant-debtor's Motion to dismiss for lack of jurisdiction.

Having performed a botched surgery on Rivera and considering that since August 2019 his medical records have been adamantly requested by the patient, the debtor should have at least suspected that a medical malpractice claim was coming his way. The debtor got Rivera's extrajudicial claim on February 23, 2021, before his Reorganization Plan was confirmed, thus he could not deny knowledge of the existence of the claim, even though he neatly concealed this information in the ongoing action.  With total disregard for whatever rights the appearing party could have during the bankruptcy proceedings, the

debtor excluded his claim, neither was Rivera notified of the fact of his October 30, 2019

bankruptcy filing.

A written disclosure statement and a plan of reorganization must be filed with

the court.[7] The disclosure statement is a document containing all the information as to the

assets, liabilities, and business affairs of the debtor sufficient to enable a creditor to make

an informed judgment about the debtor's plan of reorganization.[8] However, Rivera was

intentionally denied access to these proceedings.

It is completely fair that unlisted creditors, such as Rivera, could be kept out of the

bankruptcy proceedings to pursue their claims. The omitted creditor should have the right

to continue to pursue his claim and seek a judgment against the debtor, unaffected by the

debtor's reorganization plan and any discharge order that might eventually be entered.

Last but not least, the legal system cannot be used as a safe haven for cunning

means of misdirecting the search, deceiving the court, parties with interests, or hiding

evidence that is ultimately required. Although the U.S. Bankruptcy Code does not define

"bad faith" specifically, courts have determined that several actions, including dishonesty,

fraud, and attempts to manipulate or misuse the bankruptcy process' protections, can be

considered as such. To achieve an unfair advantage through the manipulation of the

bankruptcy or litigation process before the Title III Judge, the debtor intentionally delayed

including Rivera as a creditor. The debtor could inform the bankruptcy court and his

creditors of Rivera's claim, since he knew of it, this is, since February 23, 2021, before

the reorganization plan confirmation hearing. In the case of:   In re Little Creek

Development Co., 779 F.2d 1068 (5th Cir. 1986), the court examines how bad faith could

---

[7] 11 U.S.C. §§ 1121, 1125.
[8] 11 U.S.C. § 1125.

prevent a Chapter 11 filing from being confirmed. According to <u>Carolin Corp. v. Miller</u>, 886 F.2d 693, 698 (4th Cir. 1989) (citing <u>In re Winshall Settlor's Trust</u>, 758 F.2d 1136, 1137 (6th Cir. 1985)), "good faith on the part of the debtor is an implied prerequisite to the right to file [a chapter 11 petition], the absence of which may constitute cause for dismissal."

There is no question that the debtor was aware of Rivera's claim and purposefully withheld addressing it until a crucial juncture in the civil case, throughout the course of the discovery procedure, long after the initial disclosures, when he learned about the expert opinion against him and took Rivera's and his witness depositions. As said, the debtor held off on requesting a stay of his medical malpractice case until after the discovery process had yielded extensive material regarding Rivera and his grounds of action. The debtor's actions are an obvious attempt to strategically delay and manipulate the civil proceedings, re-victimizing Rivera, by gaining a sufficient understanding of his risk exposure in the lawsuit before requesting the applicability of the stay and Rivera's inclusion as an omitted creditor by amending the corresponding Schedule.

WHEREFORE, the appearing party requests from this Honorable Court to deny the debtor's amendment to Schedule E/F including Rivera as an omitted creditor, and further denying the discharge of his claim.

In Caguas, Puerto Rico, this 12th day of June 2023.

I HEREBY CERTIFY that on this same day, I personally filed the foregoing with the Clerk of the Court which will use the CM/ECF system to automatically send notifications of such filing to the parties with interests and attorneys of record.

**VELÁZQUEZ LAW OFFICES, PSC**

Attorneys for Juan C. Rivera Pedrogo
PO Box 188
Caguas, Puerto Rico 00726
Tel. 787-744-9598 / 787-417-7256
E-mail: jfvlaw@gmail.com

s/José F. Velázquez Ortiz
JOSE F. VELAZQUEZ ORTIZ
USDC-PR 123310

# VELAZQUEZ LAW OFFICES

**EXHIBIT 1**

## Attorneys and Counselors at Law

A-12 Ángel Ortiz St., Paradis
PO Box 188, Caguas, Puerto Rico 00726
Tel. 787-744-9598 φ 787-417-7256
www.impericiamedica.com
E-mail: jfvlaw@gmail.com

17 de febrero de 2021

Dr. Fernando Villamil-Wiscovitch
1809 E. 13th Street
Suite 200 & 300
Tulsa, OK 74104

\*\*\*

512 N Franklin St
Jenks, OK 74037

*Re: Juan Rivera Pedrogo*
*Reclamación extrajudicial*

Estimado doctor Villamil:

Nuestro bufete, por medio del abogado que suscribe, representa al Ing. Juan Carlos Rivera Pedrogo en esta reclamación extrajudicial en su contra, enviada a sus dos direcciones conocidas. Ello, por negligencia profesional médica en sus intervenciones con el paciente de referencia.

Durante el 2017, Juan Carlos experimentó fuertes dolores de espalda baja, que le imposibilitaron de correr, aunque le permitieron continuar con el ciclismo. Tomó terapias físicas con una fisiatra en su pueblo de Aibonito, pero los dolores y molestias en su espalda continuaron. Se le realizaron radiografías que no mostraron mayores daños en su columna y estructura de discos, aunque un MRI evidenció anormalidades, por lo que varias amistades le recomendaron acudir donde usted.

Durante la primera visita, usted evaluó las lecturas del MRI, refiriéndolo al anestesiólogo Dr. Jan J. Kraemer para bloqueos. El Dr. Kraemer sometió a Juan Carlos a un bloqueo mensual, durante los meses de abril, mayo y junio de 2018. Al continuar los dolores y molestias en su espalda, Juan Carlos volvió el 20 de agosto de 2018 a la oficina del doctor Villamil, cuando ordenó otro MRI, para confirmar la condición de los discos entre Lumbar 4-Lumbar 5 y Sacral 1.

Ante los resultados entregados en septiembre de 2018, usted le indicó que su condición requería una cirugía, separando el 6 de noviembre de 2018 para realizarla en el Presbyterian Community Hospital en San Juan, Puerto Rico. Según le explicara a Juan

Carlos, la cirugía consistiría en remover los dos discos y colocar una placa con tres tornillos, uno en cada vértebra.

Según programada, la cirugía se realizó el 6 de noviembre, pero, al despertar de la anestesia general, sin embargo, el dolor del paciente era intenso, por lo que le suplicó le diera "algo para el dolor", ordenándole usted morfina. A requerimientos del doctor Villamil, el paciente movió su pierna izquierda, más no así la derecha, ni tampoco los dedos de esa extremidad. Usted le dijo entonces que la cirugía se había complicado, que tuvo que hacer "un procedimiento adicional al planificado" y que recuperaría el movimiento de la extremidad inferior en los próximos días.

Además de no haber recuperado el movimiento de su pierna derecha, al día siguiente de la cirugía el dolor era más intenso, administrándole entonces a Juan Carlos morfina y Percocet, entre otros medicamentos. A insistencia de Juan Carlos, usted le dijo que durante la cirugía, había encontrado una "fisura" o fractura, probablemente ocasionada en su niñez, la cual tuvo que remediar colocando otra placa y dos tornillos adicionales.

Respecto a la falta el movimiento de su extremidad, usted reiteró que iba a recuperarlo en los próximos días, tal y como le sucedió a otro paciente que tuvo. Al no recuperar su movimiento de su pierna derecha, al tercer día de su cirugía trasladan a Juan Carlos en ambulancia a Health South en Manatí, una institución de rehabilitación física.

A pesar de no tener movimiento en su pierna derecha, el paciente, sin embargo, desarrolló un dolor insoportable en el área. En Health South le diagnosticaron que su dolor era neuropático, realizándole terapia ocupacional, física, psicológica, viéndolo distintos especialistas.

Durante las primeras dos semanas, Juan Carlos recuperó algunos movimientos de su pierna derecha, aunque no en la parte trasera/interna del muslo (músculos aductores) y del tobillo hacia abajo. Para el dolor a Juan Carlos le administraron cuatro dosis diarias de dos Percocet, una Klonopin al día), tres dosis de Neurontin 800mg al día, dos dosis de Morfina de 300mg al día, entre muchos otros medicamentos. A pesar de la administración de tantos medicamentos para el dolor, Juan Carlos no dormía y lloraba del dolor. Al no tener mejoría del dolor, le realizaron un CT Scan en el Doctors' Hospital de Manatí, no teniendo una lectura clara por la inflamación resultante de la cirugía que usted le practicara.

Juan Carlos salió del centro de rehabilitación el 21 de noviembre de 2018, por lo que no pudo asistir a una cita con usted, aunque se mantuvo en todo momento conectado con a través de mensajes de texto.

Para el 10 de diciembre, Juan Carlos se comunicó con usted, indicándole que el dolor era insoportable, a pesar de los medicamentos que ingería, por lo que lo refirió nuevamente donde el doctor Kraemer, haciendo arreglos para verlo el 11 de diciembre de 2018, aunque el dolor no mejoró luego de prescribirle un medicamento llamado MS-Contin15mg.

Buscando alternativas para posibles terapias y/o tratamientos, Juan Carlos acude a la oficina del Dr. Luis A. Sánchez, un fisiatra con especialidad en medicina deportiva, quien lo evaluó y recomendó varias terapias físicas (calor, corriente y masajes). Aunque fue discreto, en su primera evaluación el doctor Sánchez le indicó a Juan Carlos que algo había salido mal.

En visitas de seguimiento, el doctor Sánchez le indica a Juan Carlos que no era normal que una persona joven y con historial atlético tuviera una pérdida completa de movimiento en el pie y que luego de varios meses, aproximadamente dos en aquel momento, se esperaba que al menos el dolor bajara de intensidad  y que al menos esperaba ver algún movimiento leve en los dedos.

En enero 2019, el doctor Sánchez refirió a Juan Carlos a la Dra. Lugo, otra fisiatra, para que realizara un estudio de conductividad nerviosa. La lectura del estudio realizado por la doctora Lugo demostró que Juan Carlos no tenía reacción/respuesta en el nervio que nace en la vértebra L5.

En el mes de enero, usted vio a Juan Carlos, en cita de seguimiento, indicándole que podía comenzar a realizar ejercicios leves en el gimnasio, como parte de la recuperación y fortalecimiento de los músculos, siendo notable la pérdida de mucha masa muscular y 22lbs de peso, dándole cita para mayo de 2018, como parte de un protocolo de citas post quirúrgicas.

Luego de seis meses sin poder trabajar, Juan Carlos regresó a su empleo el 29 de abril de 2019, con varias restricciones ocupacionales. Como no había recuperado, Juan Carlos esperó esperanzado la cita que usted le había dado para mayo de 2019, la que fue unilateralmente cancelada y pospuesta para el 25 de julio de 2019.

Luego de varios intentos fallidos, ya que según le indicaron, usted estuvo de mudanza de oficina y fuera de PR, Juan Carlos logró comunicarse molesto con su oficina, por lo que le adelantaron su cita para el 27 de junio de 2019, esta vez en las oficinas del doctor Kraemer que, alegadamente, comenzó a compartir. En la referida visita, usted le hizo varias recomendaciones de tratamiento, refiriéndolo a un cirujano y a otro fisiatra para evaluación y estudios.

Al ver las imágenes, un cirujano opinó que el problema se originaba con toda probabilidad del segundo implante que le fue puesto a Juan Carlos, por la falta de continuidad del nervio correspondiente al implante colocado. Por la localización de

entrada del segundo implante éste no se recomienda colocar por ese lugar, por los altos
riesgos de daño a nervios, lo que no le fue advertido a Juan Carlos por usted.

El nuevo cirujano le recomendó a Juan Carlos realizarse dos bloqueos en dos
lugares específicos, para ver si la molestia en su espalda baja disminuía. Indicó, además,
que si la molestia disminuía ello era una buena señal para que poder intervenir
quirúrgicamente y "descomprimir" un poco el área afectada, haciendo una exploratoria.

Se pudo realizar solo uno de los dos bloqueos programados, ya que uno de los
cinco tornillos implantados en la cirugía obstruía el paso. Ante la situación del paciente, a
éste solo le resta someterse a una o varias cirugías de descompresión. Aun no se sabe la
suerte que correrá Juan Carlos de los procedimientos quirúrgicos a los que tendrá que
someterse en el futuro para corregir su condición, ni las terapias físicas, ocupacionales y
psicológicas, siendo

Sus intervenciones con el paciente evidenciaron desviaciones extremas de la
buena práctica de la medicina y como resultado de estas desviaciones de la buena práctica
de la medicina y los estándares de diagnóstico en presentaciones clínicas similares, Kste
ha sufrido daños y perjuicios, que estima en una suma no menor de TRES MILLONES
DE DOLARES ($3, 000,000.00) y pérdida de ingresos no menor de $100,000.00, que,
por medio de la presente se reclama.

Una reclamación judicial fue hecha inicialmente el 28 de octubre de 2019 y
archivada sin perjuicio el 21 de marzo de 2020, siendo el propósito de la presente y de la
anterior, interrumpir el término prescriptivo correspondiente. Además de usted y todos
los médicos mencionados en la presente, Juan Carlos es testigo de los hechos que se
relatan precedentemente, cuya dirección es: Mirador Las Delicias #57, HC-02 Box
13301, Aibonito, Puerto Rico 00705.

Sin otro particular, se suscribe,

Cordialmente,

José F. Velázquez Ortiz

CERTIFICADAS CON ACUSE DE RECIBO
1.  7018 3090 0001 8046 4120
2.  7018 3090 0001 8046 4113



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT** Jose Rivera Rodriguez
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

Tulsa, OK 74114 NORTH

OFFICIAL USE

Certified Mail Fee    $3.95    0726
                                      66
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)    $0.00
☐ Return Receipt (electronic)    $0.00    Postmark
☐ Certified Mail Restricted Delivery    $0.00    Here
☐ Adult Signature Required    $0.00
☐ Adult Signature Restricted Delivery $
Postage    $0.55
$
Total Postage and Fees    $7.00    02/17/2021
$
Sent To  Dr. Fernando Villanui - Wiscovitch
Street and Apt No., or PO Box No.
1809 E. 13th Street Suite 200 & 300
City, State, ZIP+4®
Tulsa, OK 74104

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7018 3090 0001 8046 4120

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dr. Fernando Villanui - Wiscovitch
1809 E. 13th Street
Suite 200 & 300
Tulsa, OK 74104

9590 9402 6265 0274 8810 96

2. Article Number (Transfer from service label)
7018 3090 0001 8046 4120

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X CBH 402    ☐ Agent
                      ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
CH    2-23-21
D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature    ☐ Priority Mail Express®
☐ Adult Signature Restricted Delivery    ☐ Registered Mail™
☑ Certified Mail®    ☐ Registered Mail Restricted Delivery
☐ Certified Mail Restricted Delivery    ☐ Signature Confirmation™
☐ Collect on Delivery    ☐ Signature Confirmation
☐ Collect on Delivery Restricted Delivery    Restricted Delivery
Mail
Mail Restricted Delivery
)0)

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

**EXHIBIT 2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JUAN C. RIVERA-PEDROGO | |
| *Plaintiff,* | CIVIL NO. |
| **Vs.** | |
| **DR. FERNANDO L. VILLAMIL-WISCOVITCH** | **TRIAL BY JURY DEMANDED** |
| *Defendants,* | |

## C O M P L A I N T -

**TO THE HONORABLE COURT:**

**COMES NOW** plaintiff, through the undersigned counsel, and very respectfully states, alleges and prays as follows:

### *I. NATURE OF THE ACTION*

1.1     This is an action brought by plaintiff seeking compensatory damages as the result of the defendant's tort and negligent actions and omissions. These acts and omissions took place when plaintiff was subjected to an unindicated and negligently performed back spine surgery under the services of defendant Dr. Fernando L. Villamil-Wiscovitch, at San Juan, Puerto Rico. Plaintiff's damages were caused as the direct result of said defendant's gross negligent/faulty acts and omissions.

Complaint

Case:19-06327-ESL11   Doc#:208   Filed:06/12/23   Entered:06/12/23 15:10:30   Desc: Main
Case 3:22-cv-01030 Document 1-21 Filed 01/24/22   Page 2 of 8

2

## II. JURISDICTION AND VENUE

2.1     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, as plaintiff is of diverse citizenship from the defendants and the amount in controversy, exclusive of interest and costs, is in excess of seventy-five thousand dollars ($75,000.00).

2.2     Venue is proper pursuant to 28 U.S.C. §1391(a), as plaintiff is resident of the Puerto Rico, while defendant is resident of the State of Oklahoma and as all the events and omissions giving rise to the claim occurred within the jurisdiction of Puerto Rico.

2.3     According to 28 U.S.C. §1332 and the Seventh Amendment of the United States constitution, the plaintiff demands trial by jury in all the causes of action asserted herein.

## III. THE PARTIES

3.1     Plaintiff Juan C. Rivera-Pedrogo is an industrial engineer, with a master's degree in management and residing in Puerto Rico.

3.2     Dr. Fernando L. Villamil-Wiscovith was the physicians who treated Mr. Rivera-Pedrogo at San Juan, Puerto Rico and, consequently, was responsible for his medical care since the very first visit, surgery, and subsequent treatment alleged to in this complaint.  As more particularly set forth below, the negligent acts and omissions of said defendant caused and contributed plaintiff's damages.

## IV. THE FACTS

4.1     From a young age, plaintiff led a very healthy life and participated in sports, beginning with basketball, volleyball and baseball, and then participating and excelling in triathlon competitions in and outside Puerto Rico such as "The Ironman".

Case:19-06327-ESL11   Doc#:208   Filed:06/12/23   Entered:06/12/23 15:10:30   Desc: Main
Case 3:22-cv-01030 Document Page 22 of 72 Filed 11/24/22   Page 3 of 8

3

4.2     During 2017 plaintiff experienced severe low back pain that rendered impossible for him to continue running and participating in triathlon competitions, although he continued to ride on his bicycle.

4.3     While radiology images showed no major damage to plaintiff's spine and discs structure, after taking some physical therapies with a physiatrist the pain and discomfort continue to bother him through the following months.

4.4     Some friends from work recommended plaintiff orthopedist spine surgeon defendant Dr. Fernando L. Villamil-Wiscovitch, so he made a medical appointment to be evaluated by him.

4.5     During plaintiff's first visit, Dr. Villamil looked at the MRI readings and referred him to an anesthesiologist, giving him a follow up appointment for August 20, 2018.

4.6     The anesthesiologist put plaintiff through a three consecutive monthly blockage therapy from April to June 2018, that rendered no positive results for plaintiff.

4.7     On his August 20th. appointment with Dr. Villamil, he ordered plaintiff a new MRI to supposedly "confirm" the condition of the discs between L4-L5 and S1, which readings were delivered to his offices in September 2018, at which time he recommended surgery, which was scheduled to be performed at the Ashford Presbyterian Hospital in San Juan, Puerto Rico.

4.8     According to plaintiff's expert, preoperative MRI showed mild degenerative changes at L4-5 and L5-S1 with varying degrees of stenosis ranging from mild at the L4-5 and L5-S1 foramen, to moderate at the L4-5 level centrally.

4.9     Prior to the proposed surgery, however, no signs of instability or severe foraminal stenosis were seen at either the L4-5 or L5-S1 level.

Case:19-06327-ESL11   Doc#:208   Filed:06/12/23   Entered:06/12/23 15:10:30   Desc: Main
Case 3:22-cv-01088 Document 12-1 Filed 11/24/22   Page 4 of 8

4

4.10    As explained to the plaintiff by defendant doctor, the proposed surgery would consist of the removal of the two discs, placing a plate with three screws, one in each vertebra.

4.9    A lateral interbody fusion at L4-5 and L5-S1 with unilateral posterior fixation was performed on November 8, 2018, and, according to the operative report, partial corpectomies at L4, L5, and S1 were also done.

4.10    Following the surgical procedure, plaintiff awoke with intense low back pain and multiple neurologic deficits in the right lower extremity including a dense foot drop, which defendant doctor attributed to a intraoperative finding that complicated the proposed surgery, which prompted him to perform additional procedures.

4.11    According to defendant's operative report, in addition to the unilateral lateral interbody fusion at L4-5 and L5-S1 with unilateral posterior fixation, partial corpectomies at L4, L5, and S1 were performed.

4.12    Contrary to defendant's statements on his operative report, plaintiff's expert opines that postoperative imaging studies shows that the L4, L5, and S1 vertebral bodies are still fully present, which is evidence that no partial corpectomy was performed by surgeon at any of these levels.

4.13    Defendant additionally wrote in the operative note that the patient's intraoperative neuromonitoring signals were "excellent throughout the entire procedure", however a nerve root resulted damaged, being the intraoperative neuromonitoring record conveniently unavailable as per plaintiff's multiple requests.

4.13    The neurological deficits persisted on the following day after surgery so, asked by plaintiff to explain the alleged complication, defendant responded that he found a small "fissure,

Case:19-06327-ESL11   Doc#:208   Filed:06/12/23   Entered:06/12/23 15:10:30   Desc: Main
Case 3:22-cv-01063 Document 1-24 Filed 01/24/22   Page 5 of 8

5

probably a fracture from childhood", which he had to take care of by placing another plate and two additional screws.

4.14    The patient started physical therapy immediately after being discharged from hospital.

4.15    Despite months of therapy following the surgery, and representations from defendant doctor that all sequelae were going to vanish, plaintiff's conditions did not improve.

4.16    Desperate for his persistent pain, atrophy and profound weakness of the right lower extremity and frustrated with defendant excuses, the patient sought and underwent a revision procedure with Dr. Yamil Rivera-Colon in November 2019, consisting of a right L5-S1 laminectomy facetectomy, in which no improvement of his neurological and physical condition was accomplished.

4.17    At present, the patient, with 43 years of age, has persistent pain, atrophy, and profound weakness of the right lower extremity, requiring an Ankle Foot Orthoses (AFO) to assist with ambulation and get back to work.

4.18    Apart from being very expensive and uncomfortable, the AFO must be always used provoking him to fall since the mechanics of ambulation have constantly changed, he has noticeably lost corporeal mass in his leg, prompting him to modify his clothing and developed "hammer foot", loss of sensation in the foot extremity among other things. thus, been unable to return to the healthy and relatively active lifestyle he was enjoying prior to the defendant's surgical procedure in November 2018.

4.19    After having developed morphine dependency for several months following defendant's surgery, not having identified any alternate medication, therapy or action that reduces it, aside his present physical disability, plaintiff has been forced to live forever in pain.

Case:19-06327-ESL11   Doc#:208   Filed:06/12/23   Entered:06/12/23 15:10:30   Desc: Main
Case 3:22-cv-01008-Document   Page 25 of 72/24/22   Page 6 of 8

6

## V.     MEDICAL MALPRACTICE CLAIMS

5.1     Defendant Dr. Fernando Villamil's surgery deviated from the standard of care in multiple ways regarding his treatment of plaintiff Juan Rivera Pedrogo, thus, incurring in gross negligence and medical malpractice.

5.1     First and foremost, plaintiff had lumbar stenosis at L4-5 and L5-S1 without instability; a lumbar decompression surgery without fusion would have been the appropriate surgery for his condition.  Consequently, defendant performed an unindicated lumbar interbody fusion at L4-5 and L5-S1, subjecting Mr. Rivera Pedrogo to loss of motion at the L4-5 and L5-S1 levels which, over time, has been shown to contribute to the development adjacent segment disease, since the force at the lower lumbar spine will be concentrated at the level above and/or below the fusion.

5.2     Secondly, defendant deviated from the accepted standard of care by performing the lateral lumbar interbody fusion at L5-S1, which it is only indicated for fusion procedures at the L4-5 level or above since the iliac crest and presence of the crossing lumbar nerve roots precludes safe passage to the L5-S1 level. Hence, a lateral lumbar interbody fusion is contraindicated at L5-S1 level due to the inordinately high rate of neurologic injury when performed at this level, as happened in plaintiff's case.

5.3     By performing the contraindicated lateral interbody fusion at L5-S1 level, defendant Dr. Villamil knowingly put many of plaintiff's lumbar nerve roots at considerable risk of injury, including the L5 nerve root, which was precisely the nerve root damaged during his procedure.

5.4     Defendant Dr. Villamil also billed plaintiff's health plan insurance for procedures which were never done, to wit: partial corpectomies at L4, L5, and S1. The available objective

Case:19-06327-ESL11   Doc#:208   Filed:06/12/23   Entered:06/12/23 15:10:30   Desc: Main
Case 3:22-cv-01080 Document 1 Page 26 of 72 Filed 01/24/22   Page 7 of 8

7

evidence shows that there were no reasonable indications for lumbar corpectomy to remove any of the vertebral bodies during defendant's procedure. No tumor, fracture, severe spinal deformity, or retro vertebral compression was noted on the preoperative imaging were even a partial corpectomy requires removal of more than 30% of the vertebral body. Furthermore, removal of a bone requires a big hunk of metal or cadaver bone in its place to restore stability, however, the interbody cages in this case were placed by defendant between three fully present bones, L4, L5 and S1.

5.5     Defendant's actions were below and deviated from the standard of care, and created a situation of enormous complexity for revision, and ultimately led to the persistent pain, atrophy, and profound weakness demonstrated by plaintiff Juan Rivera-Pedrogo.

5.6     Plaintiff's physical, emotional and monetary damages are exclusively attributed and the result of defendant's gross negligence and medical malpractice.

## VI.     DAMAGES

6.1     As the direct and proximate result of the negligent acts and omissions of defendant doctor alleged heretofore, plaintiff Juan C. Rivera Pedrogo has suffered, is suffering and will continue to suffer intense and permanent physical and emotional damages and economical loss, all of which are estimated in an amount of not less than THREE MILLION ONE HUNDRED THOUSAND DOLLARS ($3,100,000.00).

6.2     Defendant is liable to plaintiff for his negligent acts and omissions, which prompted the instant complaint.

6.3     The statute of limitations applicable to the instant case was interrupted by the filing of a lawsuit on October 28, 2019, at the Court of First Instance of Puerto Rico, San Juan Part, in the Civil Case No. SJ2019CV11363 eventually dismissed without prejudice on March

Case:19-06327-ESL11  Doc#:208  Filed:06/12/23  Entered:06/12/23 15:10:30  Desc: Main
Case 3:22-cv-01063  Document 27-1  Filed 01/24/22  Page 8 of 8
Document  Page 27 of 72

8

21, 2020. Plaintiff subsequently sent an extrajudicial claim against defendants, by certified mail, which was received by him or his agent on Tulsa, Oklahoma on February 23rd. and by his insurance company SIMED on February 26, 2021, to which it was referred.

**WHEREFORE**, it is respectfully requested from this Honorable Court to enter judgment on plaintiffs' behalf and against defendants, granting plaintiff with the amounts claimed to in this complaint, plus prejudgment interest, costs, and attorneys' fees.

In Caguas, Puerto Rico, this 21st. Day of January 2022.

I CERTIFY that copy of this complaint has been sent to the Insurance Commissioner of Puerto Rico and the "Junta de Licenciamiento y Disciplina Médica de Puerto Rico", to their respective known addresses.

**VELÁZQUEZ LAW OFFICES, PSC**

Attorneys for the plaintiff
PO Box 188
Caguas, Puerto Rico 00726
Tel. 787-744-9598 / 787-417-7256
*E-mail: jfvlaw@gmail.com*

*s/José F. Velázquez Ortiz*
JOSE F. VELAZQUEZ ORTIZ
*USDC-PR 123310*

**EXHIBIT 3**

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the
### FOR THE DISTRICT OF PUERTO ▼

| | | |
|---|---|---|
| JUAN C. RIVERA PEDROGO | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  22-1039 (FAB) |
| DR. FERNANDO L. VILLAMIL WISCOVITCH | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  DR. FERNANDO VILLAMIL WISCOVITCH
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court.  It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver.  To avoid these expenses, you must return the signed waiver within   30  days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent.  Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court.  The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:      01/26/2022

*Signature of the attorney or unrepresented party*

JOSE F. VELAZQUEZ-ORTIZ
*Printed name*

PO BOX 188
CAGUIAS, PUERTO RICO 00726
*Address*

jfvlaw@gmail.com
*E-mail address*

787-744-9598 / 417-7256
*Telephone number*

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DR. Fdo. L. Villamil
1809 E. 13th Street
Suite 200 & 300
Tulsa, OK 74104

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 6265 0274 8985 51

2. Article Number (Transfer from service label)
7018 3090 0001 8051 0360

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Bru Schro_   ☑ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Bruce Schulb   1/21/22

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

---

7018 3090 0001 8051 0360

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

**OFFICIAL USE**

Certified Mail Fee   $3.75
$3.75

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)   $____
☐ Return Receipt (electronic)   $_0.00_
☐ Certified Mail Restricted Delivery   $_0.00_
☐ Adult Signature Required   $_0.00_
☐ Adult Signature Restricted Delivery $____

Postage   $0.78
$0.78

Total Postage and Fees   $7.58
$7.58

Sent To Dr. Fernando L. Villamil
Street and Apt. No., or PO Box No. 1809 E. 13th St. Suite 200 & 300
City, State, ZIP+4® Tulsa OK 74104

01/26/2022

Postmark
Here

0726
11

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico

|  |  |  |
|---|---|---|
| **JUAN CARLOS RIVERA-PEDROGO** | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:22-cv-01039-FAB |
| | ) | |
| **DR. FERNANDO L. VILLAMIL-WISCOVITCH** | ) | |
| | ) | |
| *Defendant* | ) | |

## AFFIDAVIT OF SERVICE

I, Sandra Felix, being duly sworn, state:

I am 18 years or older and not a party to this action or a member of a corporation or organization that is a party to this action.

I served the following documents on Dr. Fernando Villamil-Wiscovitch in Tulsa County, OK on February 18, 2022 at 11:35 am at Spine by Willamil MD, 505 E Main Street, Jenks, OK 74037 by personal service by handing the following documents to an individual identified as Dr. Fernando Villamil-Wiscovitch.

Complaint with Jury Trial
Summons

Additional Description:
Dr. Fernando Villamil-Wiscovitch willing accepted service of the documents.

White Male, est. age 50, glasses: N, Brown hair, 180 lbs to 200 lbs, 5' 9" to 6'.
Geolocation of Serve: http://maps.google.com/maps?q=36.0458524695,-95.9647984171
Photograph: See Exhibit 1

I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS HEREIN ARE TRUE AND CORRECT.

Executed in ___Tulsa___,
___OK___ on ___2·26·22___.

_____
Signature
Sandra Felix
(562) 505-0374

# Exhibit 1

Exhibit 1a)



**EXHIBIT 5**

SI-0634 (GV)
21-18157 M/G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN C. RIVERA PEDROGO          *
                                *
                                *
Plaintiff                       *
                                *          CIVIL NO: 22-cv-1039(FAB)
vs.                             *
                                *
DR. FERNANDO L. VILLAMIL        *
WISCOVITCH                      *
ET AL                           *
                                *
Defendants                      *
* * * * * * * * * * * * * * *   *

<u>**ANSWER TO COMPLAINT**</u>

TO THE HONORABLE COURT:

Comes now, Dr. Fernando L. Villamil Wiscovitch, through his
undersigned attorney, and to this Honorable Court respectfully
alleges and prays:

*I. NATURE OF THE ACTION*

1.1  The averments do not comply with Rules 8(e)1 and 10(b)
of the Federal Rules of Civil Procedure which make it unreasonable
for the appearing party to make an allegation. Any negligence by
Dr. Villamil is denied.

*II. JURISDICTION AND VENUE*

2.1  Denied.

1

2.2  Denied  since  Dr.  Fernando  Villamil  Wiscovitch  is domiciled in Puerto Rico.

2.3  No allegation is made because it is not required.


### III. PARTIES

3.1  Denied for lack of knowledge or information sufficient to form a belief as to the truth of the averment.

3.2  The  first  sentence  is  admitted.  Any  negligence  is denied.


### IV. THE FACTS

4.1  Denied for lack of knowledge or information sufficient to form a belief as to the truth of the averment.

4.2  Admitted as per the history provided by the patient.

4.3  Denied in the the way it is alleged.

4.4  The appointment is admitted. The other allegations are denied for lack of knowledge or information sufficient to form a belief as to the truth of the averments.

4.5  Admitted.

4.6  Admitted.

4.7  Admitted.

4.8  Any opinion from plaintiff's expert's is denied for lack of knowledge or information sufficient to form a belief as to the truth of the averment.

4.9  Denied.

4.10 Denied in the way it is alleged.

4.11 Denied in the way it is alleged.

4.12 Denied.

4.13 to 4.15   Denied in the way it is alleged.

4.16 to 4.19   Denied for lack of knowledge or information sufficient to form a belief as to the truth of the averments.


### V. MEDICAL MALPRACTICE CLAIMS

5.1  to 5.6   Denied.


### VI. DAMAGES

6.1 and 6.2 Denied.

6.3  Denied for lack of knowledge or information sufficient to form a belief as to the truth of the averment.


### AFFIRMATIVE DEFENSES

1.   That the complaint fails to state a claim against the appearing party upon which relief can be granted.

2.   That the complaint is barred by the statute of limitations.

3.   That the appearing party did not incur in negligence.

4.   That there is no causal relationship between the alleged acts or omissions of the appearing party and the damages claimed

by plaintiffs.

5.   That according to the allegations in the complaint the damages were caused by the other co-defendants and/or third parties for whose actions the appearing party is not liable as a matter of law.

6.   That if a mistake was made in relation to the diagnosis or treatment, which is denied, it was an honest mistake in judgement and therefore there is no liability on the part of the appearing party

7.   That the court lacks jurisdiction to entertain the present cause of action because Dr. Fernando Villamil Wiscovitch is domiciled in Puerto Rico.

8.   That the alleged damages were caused by plaintiff's own actions.

9.   That pursuant to the applicable law, there is a presumption that the treatment afforded by a physician has complied with all the medical standards. The treatment afforded by the appearing defendant complied with all applicable medical standards.

10.  That the damages claimed by plaintiff, if true, which are denied, are excessive and bear no proportion to the facts alleged in the Complaint.

11.  That at all times material, the appearing defendant exercised due diligence and care in the medical attention and

4

treatment provided and did not incur in any negligence as alleged in the complaint.

12.   That any damages that plaintiff may have sustained as claimed in the complaint were the natural result of accepted complications of his previous health conditions and/or of the surgical intervention, as explained in detail to plaintiff and to which plaintiff consented and are not attributable to any negligence on the part of the appearing defendant.

13.   That there is no causal relation between the actions and/or alleged omissions of the appearing defendant and the alleged damages claimed by plaintiff.

14.   That the damages alleged in the complaint, if proven, were caused by plaintiff's own negligence and/or by that of other individuals or institutions which were not under the control of the appearing defendant for which the appearing party cannot be held responsible. Should plaintiff have a cause of action, which is denied, it would only be actionable against other third parties and/or defendants for which no responsibility is admitted.

15.   That in the alternative, and for the purposes of these affirmative defenses, it is alleged that any damages sustained by plaintiff as a result thereof, were the result of a medical condition or complication, for which damages the appearing defendant cannot be held responsible as a matter of law.

16.   That in the alternative, and for the purposes of these

affirmative defenses, although no error of judgment was present in this case, the doctrine established by the Supreme Court of Puerto Rico relative to an honest error in judgment is averred by way of affirmative defense.

17.   That plaintiff has been obstinate in filing this action and therefore must be condemned to the payment of attorneys' fees in favor of the appearing defendant.

18.   That appearing defendant reserves the right to amend this Answer to the Complaint as well as to further supplement or modify the answers and affirmative defenses as well as to file such additional actions as may be required and appropriate, depending on the investigation that may be performed, the discovery that will be conducted, and the facts and information that may develop as a result thereof.

WHEREFORE, it is respectfully requested from this Honorable Court that the complaint be dismissed as it pertains to the appearing party and that costs, expenses and attorney's fees be imposed upon plaintiff.

I CERTIFY:  That on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record, including Atty. Jose V. Velazquez and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

In San Juan, PR, March 28, 2022.

BUFETE GONZÁLEZ VILLAMIL
GONZÁLEZ PANDO PLAZA
1181 AVE. JESÚS T. PIÑERO
SAN JUAN, PR  00920-5604
TELS. 792-5200; 273-8223
FAX 273-8250
jose@gonzalezvillamil.com


*s/Jose A. González Villamil*
JOSE A. GONZALEZ VILLAMIL
USDCN  127105

**EXHIBIT 6**

SI-0634 (GV)
21-18157 M/G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


JUAN C. RIVERA PEDROGO     *
                               *
                               *
Plaintiff                 *
                               *     CIVIL NO: 22-cv-1039(FAB-CVR)
vs.                      *
                               *
DR. FERNANDO L. VILLAMIL    *
WISCOVITCH                 *
ET AL                    *
                               *
Defendants              *
                               *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


<u>**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**</u>
<u>**PURSUANT TO Fed. R. Civ. P. 12(b)(1)**</u>
<u>**WITH MEMORANDUM IN SUPPPORT IN COMPLIANCE WITH LOCAL RULE 7(a)**</u>

TO THE HONORABLE COURT:

     Comes now defendant Dr. Fernando L. Villamil Wiscovitch,
through his undersigned attorney, and respectfully moves for the
dismissal of the captioned case for lack of subject matter
jurisdiction on the grounds hereinafter set forth.

**I.    INTRODUCTION AND PROCEDURAL BACKGROUND**

     1.    The above captioned case commenced with the Complaint
filed on January 24, 2022 (Dkt. No. 1) claiming damages as a result
of the alleged medical malpractice of Dr. Fernando L. Villamil
Wiscovitch ("Dr. Villamil").

1

2.    The subject matter jurisdiction of the Court is predicated on the provisions of the diversity statute, 28 USC § 1332.

3.    It is alleged that at the time of the filing of the Complaint and at all times material plaintiff was a resident and citizen of Puerto Rico. Complaint ¶2.2.

4.    As the basis for diversity jurisdiction the Complaint further alleges that at the time of the filing of the Complaint defendant Dr. Villamil was a resident of the State of Oklahoma and therefore diversity of citizenship existed. Complaint ¶2.2.

5.    On March 28, 2022, Dr. Villamil filed the Answer to the Complaint denying the jurisdictional allegations and averring by way of affirmative defense the lack of subject matter jurisdiction on the grounds that he was, and is, domiciled in Puerto Rico. Dkt. No. 10, ¶2.2 and affirmative defense No. 7.

6.    Defendant Dr. Villamil respectfully moves to dismiss the Complaint for lack of subject matter jurisdiction as diversity of citizenship is lacking since at the time of the filing of the Complaint he was, and still is, domiciled and a citizen of the Commonwealth Puerto Rico within the meaning of the diversity statute, 28 USC § 1332.

2

## II.  THE LAW

### a.  The Diversity Jurisdiction

7.    The controlling statute is found at 28 USC § 1332 which provides in pertinent part as follows:

> (a)  The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between —
>
> (1)  citizens of different States;
>
> . . .
>
> (e)  The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

8.    Per the above cited statute, "diversity jurisdiction" in federal courts exists when two conditions are met: First, the amount in controversy must exceed $75,000. Second, all plaintiffs must be of different citizenship than all defendants.

9.    We start our analysis with the basic premises: Federal courts are courts of limited jurisdiction as defined by the Constitution and Congress. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986); Destek Grp., Inc. v. State of N.H. Pub. Utils. Comm'n, 318 F.3d 32, 38 (1st Cir. 2003). The constitutional limitations on federal jurisdiction make federal courts "courts of limited jurisdiction," Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978)(jurisdiction lacking), as

3

opposed to state courts, which are generally presumed to have subject matter jurisdiction over a case. See 13 Charles Alan Wright, Arthur R. Miller, Edward H.Cooper & Richard D. Freer, Federal Practice and Procedure § 3522, p. 100 (3d ed. 2008). Accordingly, "federal courts have the duty to construe their jurisdictional grants narrowly." Fina Air, Inc. v. United States, 555 F.Supp.2d 321, 323 (D.P.R. 2008) (citing Alicea-Rivera v. SIMED, 12 F.Supp.2d 243, 245 (D.P.R. 1998)).

10. Because of the federal court's limited jurisdiction, the party asserting jurisdiction shoulders the burden of showing the existence of federal jurisdiction. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998) (citations omitted). See also Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted) (jurisdiction lacking) ("It is to be presumed that a cause lies outside [of federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."). It then follows that a party may move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. of Civ. P. 12(b)(1).

11. Because Federal Courts are courts of limited jurisdiction, this Court has the responsibility "to police the border of federal jurisdiction". See Spielman v. Genzyme Corp, 251 F3d 1 (1st Cir. 2001) at 4. The courts must "rigorously enforce the jurisdictional limits that Congress chooses to set in diversity

cases." <u>Del Rosario Ortega v. Star Kist Foods</u>, 213 F. Supp. 2d 84 (D.P.R. 2002) at 88 (citing <u>Conventry Sewage Association v. Dworking Realty Co.</u>, 71 F.3d 1 (1st Cir. 1995) at 3). Hence, a party that seeks the jurisdiction of the Federal Courts, has an unquestionable duty to demonstrate its existence once properly challenged. <u>Murphy v. United States</u>, 45 F.3d 520 (1st Cir. 1995) at 522.

12.   When jurisdiction is absent, dismissal is required; a federal court has no discretion to hear a case that does not belong there in the first place. See <u>Belleville Catering</u>, 350 F.3d 691 (7th Cir. 2003) at 693. As a result thereof, a strong presumption against federal-court jurisdiction requires clear evidence to the contrary. <u>Boghozian v. Jaguar Land Rover N. Am., LLC</u>, Case No. CV 19-2729-JFW(PLAx), 2019 WL 1925491, at *1 (C.D. Cal. Apr. 29, 2019).

13.   Because a federal court's subject matter jurisdiction in diversity cases is predicated upon the fact that the opposing litigants are from different states, rather than upon questions of federal law, a foundational question in these cases is which law—federal or state—should apply. See also <u>Lowdermilk v. United States Bank Nat'l Assoc.</u>, 479 F.3d 994, 998 (9th Cir. 2007) ("[A]s federal courts, we are courts of limited jurisdiction and we will strictly construe our jurisdiction.").

5

14.   As a matter of law, all courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (citing Ruhgras AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)) (jurisdiction upheld).

15.   The jurisdiction of the court depends upon the state of things at the time of the action brought. See Grupo Dataflux v. Atlas Global Group, LP, 541 U.S. 567 (2004), at 570 (citation and internal quotation omitted).

**b.   The Applicable Law**

16.   In Erie Railroad Co. v. Tompkins, 304 U.S. 64, 80 (1938), the Supreme Court set forth what is now commonly known as the Erie doctrine, which generally requires a federal court to apply state substantive law, unless the matter before it is governed by federal law.

17.   Section 8 of the Puerto Rico Political Code, 1 L.P.R.A.§ 8, which is substantive applicable law, provides in its pertinent part as follows:

Every person has in law a domicile. In determining the place of domicile the following rules are to be observed:

(1) It is the place where one habitually resides when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose.

(2) There can only be one domicile.

(3) With respect to the jurisdiction of the courts a domicile cannot be lost until another is gained.

6

(4) . . .

(5) . . .

(6) . . .

(7) Domicile can be changed only by the union of act and intent.

18.  "An individual is a citizen of the state in which he is "domiciled," that is, "the state he considers his permanent home." Galva Foundry Co. v. Heiden, 924 F.2d 729, 730 (7th Cir. 1991). An individual's residence is not necessarily his domicile; a person can have more than one residence, but he can have only one domicile. See Williamson v. Osenton, 232 U.S. 619, 625 (1914); see also Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303 (2006).

19.  A natural person – such as defendant Dr. Villamil - is considered a citizen of his or her state of domicile. "[A] person is considered a citizen of a state if that person is domiciled within that state and is a citizen of the United States." 13E Wright & Miller § 3611, pp. 465–67; Gilbert v. Davis, 235 U.S. 561, 569 (1915) (jurisdiction lacking) ("If the plaintiff was domiciled in the State of Michigan when this suit was begun, he was a citizen of that state within the meaning of the Judicial Code."); Kantor v. Wellesley Galleries, Ltd., 704 F.2d 1088, 1090 (9th Cir. 1983) (jurisdiction lacking) (citations omitted).

20.  While there is no statutory definition of an individual's state of citizenship, the courts have held that it is

the state of the individual's domicile — the state he considers his permanent home. Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 63 (2d Cir. 2009) (remanded to state court for further fact finding on jurisdiction).

**c.   The Determination of Domicile**

21.   A domicile (1) is where a person has a fixed home and, when away, plans on returning; and (2) continues until a new one is acquired. An individual establishes a domicile "by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1989).

22.   A person can have only one domicile at any time. See Williamson v. Osenton, 232 U.S. 619, 625 (1914) ("The very meaning of domicil[e] is the technically pre-eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law may be determined.").

23.   In determining a natural person's domicile courts consider multiple factors. Factors relevant to a natural person's domicile include: "the party's current residence; voter registration and voting practices; situs of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license

and automobile registration; payment of taxes; as well as several
other aspects of human life and activity." 13E Wright & Miller §
3612, pp. 536-541.

24.  While the above mentioned factors, as well as others,
are taken into consideration when determining a person's domicile,
given that a person can have more than one residence, not one of
these factors are determinant but rather the single most important
one is the person's intent of relocating and remaining there. This
since, as stated by the Supreme Court, an individual establishes
a domicile not only by the physical presence in a place but in
connection with a certain state of mind concerning one's intent to
remain there. See Miss. Band of Choctaw Indians v. Holyfield, 490
U.S. 30, 48 (1989).

25.  A person only acquires a new domicile with physical
presence in a new location and intent to remain there. Sun Printing
and Publ'g Ass'n. v. Edwards, 194 U.S. 377, 383 (1904) ("[I]t is
elementary that, to effect a change of one's legal domicil[e], two
things are indispensable: First, residence in a new domicil[e];
and, second, the intention to remain there.").

26.  A domicile once established continues unless and until
a new one is shown by clear and convincing evidence to have been
acquired. 13E Wright & Miller § 3612, p. 559. See also 13E Wright
& Miller § 3613, p. 573 (discussing the test for a change in
domicile). See 15 Moore's Federal Practice ¶ 102.34[8] (noting

9

that residence in a place is not sufficient to establish a domicile) and Moore's Federal Practice ¶ 102.34[7] (noting that a domicile continues until it is changed).

27. As hereinafter shown, at the time of the filing of the Complaint defendant Dr. Villamil was, and still is, domiciled in and a citizen of the Commonwealth of Puerto Rico and consequently the captioned case must be dismissed as a matter of law for lack of diversity jurisdiction.

**III. THE RELEVANT FACTS**

28. To determine diversity of citizenship, a court can examine materials outside the pleadings. 13E Wright & Miller § 3602.1, p. 111. See Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 728 (9th Cir. 1997) (holding that district court did not err in considering declaration outside of pleadings, and that district courts have broad discretion to find facts pertinent to jurisdiction). See also St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73 (2d Cir. 2005) (citations omitted) ("It is also well established that when the question is subject matter jurisdiction, the court is permitted to rely on information beyond the face of the complaint.").

29. Extensive, and in our view excessive, discovery was conducted by the plaintiff on the issue of jurisdiction alone. This included two written interrogatories, three requests for production of documents and multiple production subpoenas served

10

by plaintiff upon various parties, within and outside Puerto Rico[1].
The only thing plaintiff choose not to do was deposing defendant;
although the deposition was agreed upon and scheduled, at the
eleventh-hour plaintiff decided against taking the deposition.

30.   The captioned case was commenced with the Complaint
filed on **January 24, 2022** (Dkt. No. 1). Thus, this is the
controlling date for purposes of determining the existence, or
absence, of diversity jurisdiction.

31.   In the course of the discovery conducted, the following
facts were developed[2]:

    a.   Dr. Villamil is a physician duly authorized to practice
         medicine, specializing in orthopedic spine surgery.

    b.   Dr. Villamil graduated from the University of Puerto
         Rico School of Medicine in the year 2001 and completed
         the Orthopedic Surgery specialty in the year 2006, also
         at the University of Puerto Rico School of Medicine.

    c.   Thereafter, Dr. Villamil completed a Fellowship in Spine
         Surgery at the Harvard Medical School in the year 2007.

    d.   Following the Fellowship Dr. Villamil returned to Puerto
         Rico and established his professional practice at the

---

[1] Production subpoenas were served by plaintiff upon the Bank of America, the
Orthopaedic Center, American Airlines, Arvest Bank, Banco Popular de Puerto
Rico, MidFirst Bank, Ashford Presbyterian Hospital and CORE Hospital.

[2] Documents supporting all of the facts averred in this motion were produced to
plaintiff and/or obtained by plaintiff through production subpoenas in the
course of the discovery conducted. The facts are attested to by defendant in
the verified statements submitted in support hereof.

Ashford Presbyterian Community Hospital in San Juan, with offices at 1372 Ashford Avenue, Condado, Puerto Rico, performing approximately 400 hundred surgeries per year.

e.   Dr. Villamil's parents lived all their lives in Puerto Rico; his father passed in the year 2022 after 52 years of marriage and his mother is still alive and lives in San Juan, Puerto Rico. Except for a brother that resides in Washington D.C., all of his immediate family live in Puerto Rico. Dr. Villamil is very close to his elderly mother who is retired and provides for her economic needs and maintenance in conjunction to his brother.

f.   Dr. Villamil married in Puerto Rico, divorced in Puerto Rico in the year 2013, and subsequently remarried in Puerto Rico under a prenuptial agreement. Upon his current marriage Dr. Villamil lived in Condado, San Juan, Puerto Rico, and in the year 2016 purchased his current home where he resides with his spouse, also in Condado, San Juan, Puerto Rico. Dr. Villamil pays the corresponding property taxes to the Municipal Income Collection Center (CRIM) as well as all utilities, all of which are under his name and are up to date and current.

12

g.   Since the beginning of his medical practice in Puerto Rico Dr. Villamil has filed yearly income tax returns with the Commonwealth of Puerto Rico as a Puerto Rico resident as well as all applicable returns, including volume of business ("Declaración de Volumen de Negocios"), municipal tax ("Patente Municipal"), quarterly unemployment and disability premiums ("Declaración Trimestral de Contribuciones de Seguro por Desempleo e Incapacidad') and the workmen's compensation insurance premiums ("Corporación del Fondo del Seguro del Estado"), as well as the required medical professional liability insurance premiums with the Puerto Rico Medical Sindicate ("SIMED") required by law to practice in Puerto Rico.

h.   Dr. Villamil maintains his medical practice in Puerto Rico, initially under the business name of 'Caribbean Orthopedic and Spine', subsequently through 'Scuderia Vertebrale PSC, a professional services corporation organized under the laws of the Commonwealth of Puerto Rico with Registry Number 348745 of which he was the sole shareholder at 1372 Ashford Avenue, Condado Puerto Rico 00907, and since the month of May, 2019, under the d/b/a of 'Fernando Villamil at Spine' at 365 Ave. Domenech, San Juan, Puerto Rico 00918, under a verbal

13

agreement with the property owner who is a friend and colleague.

i.   Since October 16, 2009, and at the time of the filing of the Complaint Dr. Villamil maintained, and still maintains, medical privileges at the Ashford Presbyterian Community Hospital in San Juan, Puerto Rico, which privileges are in force until April 30, 2024.

j.   Effective on July of the year 2018, Dr. Villamil decided to take advantage of a business opportunity in the city of Tulsa, Oklahoma, with the view of in due course franchising through offices in various states while maintaining his base in the Commonwealth of Puerto Rico. Towards that end, in the year 2018 he entered into an arrangement with The Orthopaedic Center, P.C., an Oklahoma professional corporation, to render professional services as an independent contractor. The relation ended in the year 2020 and since October 2020 he also maintains an office for the practice of his profession in Tulsa, OK under lease, located at Jenks, OK, while Puerto Rico continues to be his principal base. As required he also maintains the required professional liability insurance in Oklahoma.

k.   In July 2019, he obtained a good deal and purchased a property at Jenks OK, 74037, with the view of avoiding

not only the related expenses but the inconveniences of staying in hotels while in Oklahoma.

l.   At the time of the filing of the Complaint, and since the year 2002, Dr. Villamil has maintained a cellular telephone with the Puerto Rico (787) prefix and a Puerto Rico carrier, and since the year 2010 has maintained his postal address in San Juan with the 00908 zip code.

m.   Since the year 2019 Dr. Villamil has filed the required Income Tax Returns in Oklahoma as a Oklahoma Non-Resident with the corresponding allocations as Part-Year Resident, indicating his Puerto Rico postal box address as the mailing address.

n.   For obvious reasons, Dr. Villamil and wife purchased motor vehicles in Oklahoma for their transportation, both 2019 models, but retained their motor vehicles in Puerto Rico, including several collection vehicles.

o.   The years 2020 and 2021 were irregular and abnormal years for Dr. Villamil as well as for the rest of the world as a result of the travel limitations and restrictions imposed on the practice of medicine in general and surgery in particular resulting from the COVID-19 pandemic.  In any event, while the time he then devoted to the Oklahoma office varied and depended mainly on the number of patients that requested his services, as of

15

January 2022, which is the controlling date, the bulk of
Dr. Villamil's professional time and almost the totality
of his personal time was devoted to Puerto Rico and his
Puerto Rico office.

p. For the establishment of the Oklahoma office Dr.
Villamil had to enter into a lease agreement since he
has no personal contacts and is not known in the area.
The office is smaller in area to the Puerto Rico office.
Because of his contacts and the fact that he is very
well known in Puerto Rico and all of his colleagues are
in Puerto Rico, he was able to obtain an arrangement
through a friend and coordinate the relocation of his
offices in Puerto Rico to the current address.

q. Dr. Villamil's accountant CPA Luis Vélez Gavilán has his
offices in Puerto Rico. Dr. Villamil and wife's social
life takes place in Puerto Rico, while Tulsa, OK, is
only a business venue as part of his professional
branching plan.

r. Dr. Villamil voted in the Puerto Rico 2016 general
elections but did not vote in the 2020 elections because
on the date of the election he was physically in Oklahoma
and took advantage of the right to vote there for the
President as an American citizen.

s.  He had to surrender his Puerto Rico driver's license in order to get the Oklahoma's driver's license because it made more sense since, for whatever reason, it is very difficult to perform business transactions in the US with a driving license from Puerto Rico while it is easier to do business transactions in Puerto Rico with a driving license from Oklahoma since he has lived his whole life in Puerto Rico and everybody knows him.

t.  As stated in the verified statement submitted in support of this motion, Dr. Villamil was never deposed in this case but, had he been deposed, he would have testified that it has never been his intention to change his domicile or his permanent residence outside of the Commonwealth of Puerto Rico, certainly not to Tulsa, Oklahoma, and that his intention at the time of the filing of this action and at the present, is to remain domiciled in Puerto Rico, where he was born, raised, married, divorced, re-married, studied and became an orthopedic surgeon, where his mother and relatives live and where he intends his mortal remains to rest.

32. As a general rule, a court "may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in the suit (subject-matter jurisdiction) ...." Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.,

549 U.S. 422, 430-31 (2007). A federal court has the authority to determine whether it has jurisdiction to hear a particular case. United States v. Ruiz, 536 U.S. 622, 628 (2002) (citing United States v. Mine Workers of Am., 330 U.S. 258, 291 (1947). This Court has the required authority for a finding that it lacks subject matter jurisdiction over plaintiff's claim for want of diversity of citizenship.

33.  The traditional justification for diversity jurisdiction – to "open[] the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties" – is not present in this case. See Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010) (citations omitted) (reversing district court's finding that jurisdiction was lacking). The basis for the traditional justification for diversity jurisdiction is to minimize potential bias against out-of-state parties."). See Firstar Bank, N.A. v. Faul, 253 F.3d 982, 991 (7th Cir. 2001) (citing Guar. Trust Co. of N.Y. v. York, 326 U.S. 99, 111 (1945); Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 382 (7th Cir.1990)).

34.  Plaintiff has complete access to the courts of the Commonwealth of Puerto Rico who are more than capable to address its claims and pass judgment on its merits. Certainly, no claim of prejudice or potential bias may be alleged by reason of having his claims adjudicated by the Commonwealth courts.

18

IV. **CONCLUSION**

An individual establishes a domicile by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there. Clear and convincing evidence establishing Dr. Villamil's intent to change his domicile from Puerto Rico to Oklahoma is clearly lacking. Quite to the contrary, the intention to remain in Puerto Rico and to maintain Puerto Rico as his domicile is beyond question.

All authorities in support of this motion have been cited herein in compliance with the provisions of Local Rule 7(a) and therefore a separate memorandum of law is not required or submitted.

WHEREFORE, defendant Dr. Fernando L. Villamil Wiscovitch respectfully requests from this Honorable Court that judgment of dismissal be entered dismissing the Complaint for lack of subject matter jurisdiction, with the imposition of costs and attorneys fees against plaintiff.

I CERTIFY: That on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record, including the following: José F. Velázquez Ortiz.

In San Juan, Puerto Rico, this 25th day of January, 2023.

19

BUFETE GONZÁLEZ VILLAMIL
GONZÁLEZ PANDO PLAZA
1181 AVE. JESÚS T. PIÑERO
SAN JUAN, PR  00920-5604
TELS: 792-5200; 273-8223
FAX: 273-8250
jose@gonzalezvillamil.com

*s/Jose A. González Villamil*
JOSE A. GONZALEZ VILLAMIL
USDCN  127105

**EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN C. RIVERA-PEDROGO,

Plaintiff,

v.                                                         CIVIL NO. 22-1039 (CVR)

DR. FERNANDO L. VILLAMIL-
WISCOVITCH,

Defendant.

## OPINION AND ORDER

### INTRODUCTION

Plaintiff Juan C. Rivera-Pedrogo ("Plaintiff") brings forth this medical malpractice claim against defendant Dr. Fernando L. Villamil-Wiscovitch ("Defendant") based on diversity jurisdiction.  (Docket No. 1).  Before the Court now is Defendant's Motion to Dismiss ("Motion to Dismiss") where he alleges the Court lacks subject matter jurisdiction to hear the claim under Federal Rule of Civil Procedure 12(b)(1).  (Docket No. 35).

For the reasons stated below, the Court finds that diversity jurisdiction is present. Accordingly, Defendant's Motion to Dismiss is DENIED.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is an industrial engineer, who led an active lifestyle from a young age. (Docket No. 1, at p. 2).  He participated in a wide variety of sports and athletic competitions, including the Ironman Triathlon.  <u>Id</u>.  In 2017, Plaintiff started experiencing "severe lower back pain that rendered it impossible for him to continue running and participating in triathlon competitions. . . ." (Docket No. 1, at p. 3).  Per his coworkers' recommendations, Plaintiff visited Defendant's office for an evaluation.  <u>Id</u>.

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 2

_____

Defendant, an orthopedic surgeon specializing in the spine, evaluated Plaintiff and
referred him to an anesthesiologist, who treated Plaintiff for approximately three months
using blockage therapy. Id. These treatments proved unsuccessful at easing his pain, so
Defendant ultimately recommended that Plaintiff undergo surgery, which was scheduled
for November 8, 2018. (Docket No. 1, at pp. 3-4). "Following the surgical procedure,
[P]laintiff awoke with intense lower back pain and multiple neurologic deficits in the right
lower extremity including a dense foot drop, which defendant doctor attributed to a [sic]
intraoperative finding that complicated the proposed surgery, which prompted him to
perform additional procedures." Id. at p. 4. Plaintiff started physical therapy
immediately after his surgery, but his condition did not improve. Id. at p. 5. "Desperate
[from] his persistent pain, atrophy, and profound weakness of the right lower extremity,
. . . [Plaintiff] sought and underwent a revision procedure with Dr. Yamil Rivera-Colón
[on] November 2019"; but, like before, Plaintiff's pain did not improve. Id.

On January 24, 2022, Plaintiff filed the present suit in federal court, alleging *inter
alia* that "Defendant Dr. Fernando Villamil's surgery deviated from the standard of care
in multiple ways regarding his treatment of [Plaintiff], thus incurring in gross negligence
and medical malpractice." (Docket No. 1, at p. 6). Defendant answered the Complaint on
January 28, 2022, and subsequently filed a Motion to Dismiss for lack of subject matter
jurisdiction on January 25, 2023. (Docket Nos. 10 and 35, respectively). Defendant
claims dismissal is warranted because, although he is a resident of Oklahoma, his
domicile is in Puerto Rico. (Docket No. 35, at p. 2). Thus, since both parties are domiciled
in Puerto Rico, diversity jurisdiction is lacking and the Court should, consequently,
dismiss the Complaint. Id.

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 3

_____

Plaintiff opposed dismissal on February 22, 2023, arguing that diversity was present at the time of filing the Complaint and remains as such because Defendant's true domicile is Oklahoma. (Docket No. 41, at p. 2). To this end, Plaintiff provides a myriad of evidence that,[1] in his view, demonstrates Defendant "was domiciled in Oklahoma long before the date of the filing of [the] complaint and still is." Id.

On March 14, 2023, Defendant replied to Plaintiff's Opposition reiterating that, despite his current residence and Plaintiff's alleged "selective and anticipated biased interpretation of the facts and documents", "neither at present nor certainly at the time of the filing of this action did he have the intention of establishing his domicile in Oklahoma." (Docket No. 58, at pp. 2-3).

## LEGAL STANDARD

It is well recognized that "'[f]ederal courts are courts of limited jurisdiction, and therefore must be certain that they have explicit authority to decide a case.'" Roselló-González v. Calderón-Serra, 398 F.3d 1, 15 (1st Cir. 2004) (citing Bonas v. Town of North Smithfield, 265 F.3d 69, 73 (1st Cir. 2001)). See also Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675 (1994) ("Federal courts are courts of limited jurisdiction."). As such, "[t]hey possess only that power authorized by Constitution and statute, [. . .] which is not to be expanded by judicial decree." Kokkonen, 511 U.S. at 377 (citation omitted). Accordingly, the First Circuit Court of Appeals has consistently held that "'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" Murphy v. U.S., 45 F.3d 520, 522 (1st Cir. 1993) (citing

_____

[1] Plaintiff filed a total of twenty-seven (27) exhibits, which the Court will discuss in more detail further on in the Opinion. (Docket No. 41, Exhibits 1-27).

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 4

_____

Taber Partners, I. v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)); see also Bank

One, Texas, N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992); Spielman v. Genzyme Corp.,

251 F3d 1, 6 (1st Cir. 2001).

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(1) ("Rule 12(b)(1)"),[2] "[t]he district court must construe the Complaint liberally and

treat all well-pleaded facts as true and drawing all reasonable inferences in favor of the

plaintiffs." Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998) (citing Royal v. Leading

Edge Prods., Inc., 833 F.2d 1, 1 (1st Cir. 1987)); Murphy, 45 F.3d at 522 (citing K.W.

Thompson Tool Co. v. United States, 836 F.2d 721, 726 (1st Cir. 1988)).   "A party,

however, may not rest merely on 'unsupported conclusions or interpretations of law.'"

Murphy, 45 F.3d at 522 (citing Washington Legal Found. V. Massachusetts Bar Found.,

993 F.2d 962, 971 (1st Cir. 1993)).   "'[S]ubjective characterizations or conclusory

descriptions of a general scenario which could be dominated by unpleaded facts' will not

defeat a motion to dismiss." Id.  (citing Coyne v. City of Somerville, 972 F.2d 440, 444

(1st Cir. 1992)) (emphasis omitted).

Furthermore, in a diversity action, Rule 12(b)(1) allows "a party [to] contest the

court's subject matter jurisdiction by challenging the allegations in the complaint as

insufficient on their face or by questioning the accuracy of those allegations." Hernández-

Santiago v. Ecolab, Inc., 397 F.3d 30, 34 (1st Cir. 2005) (citing Valentín v. Hosp. Bella

Vista, 254 F.3d 358, 363 (1st Cir. 2001)).  This means that "[w]here a party challenges the

accuracy of the pleaded jurisdictional facts, the court may conduct a broad inquiry, taking

_____
[2] Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may present a motion to dismiss a case for lack of subject-
matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

evidence and making findings of fact." Id.   Thus, in cases such as this, where the

defendant's domicile presents a jurisdictional issue, "it [is] appropriate for the district

court to [accept] evidence (including affidavits) and [make] factual rulings based on the

evidence before it." Id.[3]

## LEGAL ANALYSIS

### A. Applicable Law.

28 U.S.C.A. § 1332(a)(1) provides the district court with original jurisdiction over

all civil cases between citizens of different states and where the amount in controversy

exceeds $75,000.00.  28 U.S.C.A. § 1332(a)(1).  "In a diversity action where there is no

question of ripeness, mootness, or standing, the existence *vel non* of subject matter

jurisdiction typically turns on two facts, to wit, diversity of citizenship and amount in

controversy." Hernández-Santiago, 397 F.3d at 33 (citing Valentín, 254 F.3d at 362-63).

Diversity requires a party to be a "citizen of the state in which he is domiciled."

Padilla-Mangual v. Pavía Hosp., 516 F.3d 29, 31 (1st Cir. 2008) (citing Lundquist v.

Precision Valley Aviation, Inc., 946 F.2d 8, 10 (1st Cir. 1991) and other cases); Aponte-

Dávila v. Municipality of Caguas, 828 F.3d 40, 46 (1st Cir. 2016). [4]  It is "'the place where

he has his true, fixed home and principal establishment, and to which, whenever he is

absent, he has the intention of returning.'" Meléndez-García v. Sánchez, 629 F.3d 25, 41

(1st Cir. 2010) (citing Padilla-Mangual, 516 F.3d at 31).

---

[3] See also Merlonghi v. U.S., 620 F.3d 50, 54 (1st Cir. 2010) ("The district court may also 'consider whatever evidence has been submitted, such as depositions and exhibits submitted.'" (citing Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)).

[4] See also García Pérez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004) ("Citizenship is determined by domicile, which can be established by demonstrating that the individual is physically present in the state and has an intent to remain indefinitely." (citing Lundquist, 946 F.2d at 10; Sun Printing & Publ'g Ass'n v. Edwards, 194 U.S. 377, 383, 24 S.Ct. 696 (1904); Hawes v. Club Ecuestre El Comandante, 598 F.2d 698, 701 (1st Cir. 1979)).

As such, diversity jurisdiction is determined at the time of the filing of the Complaint and once established, a subsequent change in domicile will not defeat the existence of diversity. Bank One, Texas, N.A. v. Montle, 964 F.2d 48, 49 (1st Cir. 1992) (citing Lundquist, 946 F.2d at 10; Valedón Martínez v. Hospital Presbiteriano de la Comunidad, Inc., 806 F.2d 1128, 1132 (1st Cir. 1986); Hawes, 598 F.2d at 701). See also García Pérez, 364 F.3d at 350-51 ("The key point of inquiry is whether diversity of citizenship existed at the time the suit was filed; subsequent events may bear on the sincerity of a professed intention to remain but are not part of the primary calculus." (citing Hawes, 598 F.2d at 700; Miranda v. Miranda, 686 F.Supp. 44, 47 (D.P.R. 1988)).

Now, "[w]hen a defendant challenges the court's jurisdiction based on lack of diversity, 'the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction.'" Meléndez-García, 629 F.3d at 40 (citing Padilla-Mangual, 516 F.3d at 31, and cases quoted therein). To prove domicile a party must demonstrate: "(1) 'physical presence in a place,' and (2) 'the intent to make that place one's home.'" Aponte-Dávila, 828 F.3d at 46 (citing Valentín, 254 F.3d at 366). To say that domicile and residence are the same is, therefore, inapposite. Id.

Regarding intent, the First Circuit has consistently used the following factors to determine a party's domicile: "the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment." Meléndez-García, 629 F.3d at 41 (citing Padilla-Mangual, 516 F.3d at 32). The number of ties a person has with a

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 7

_____

place, as well as the significance of those ties, must be analyzed when deciding where a

person is domiciled.  See Aponte-Dávila, 828 F.3d at 47 (citing García-Pérez, 364 F.3d at

351).  Furthermore, "'[w]hile no single factor is controlling, some courts have presumed

domicile in a state is established where a party is registered to vote.'"  Id.  Although the

First Circuit "has not recognized such a presumption, [it has] said that the place a person

is registered to vote is a 'weighty' factor in determining domicile."  Padilla-Mangual, 516

F.3d at 32 (citing Lundquist, 946 F.2d at 12).

   **B. Discussion.**

   As previously mentioned, Defendant alleges the Court lacks subject-matter

jurisdiction because, while he is a resident of Oklahoma, he was domiciled in Puerto Rico

at the time of filing the Complaint and remains so to this date.  (Docket No. 35).  Plaintiff

argues, however, that Defendant's true domicile, both currently and as of the date the

Complaint was filed, is Oklahoma.  (Docket No. 41).  Defendant avers that the Plaintiffs'

interpretation of the exhibits is erroneous, yet he does not contest their veracity.

Defendant also failed to submit any documentary evidence in support of his Motion to

Dismiss, other than an unsworn statement alleging his intent to remain domiciled in the

island.   Therefore, upon examining the parties' submissions, the Court agrees with

Plaintiff.

   It is uncontested from the filings on record that Defendant had various ties to the

state of Oklahoma, at the time of the filing of the complaint, which continue to this day.

For example: (1) he obtained his medical license in Oklahoma in 2018; (2) he surrendered

his Puerto Rico driver's license and obtained a valid Oklahoma driver's license; (3) he has

a thriving medical practice and corporation named Scuderia Spinale, PLLC, in Jenks,

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 8

_____

Oklahoma, for which he pays approximately $2,860.00 in monthly rent; (4) he

medical privileges at the CORE hospital in Tulsa, Oklahoma; (5) he has business accounts

in an Oklahoma bank; (6) he pays income and property taxes in Oklahoma; and (7) he

registered to vote, and effectively voted, in the 2020 presidential elections.   More

significant ties to Oklahoma include: (1) the luxury cars both he and his wife own and use

in Oklahoma; (2) the six-bedroom home he owns in Jenks, Oklahoma, valued at over one

million dollars ($1,000,000.00), for which he pays a substantial monthly mortgage of

$5,851.00, plus over $21,000.00 in annual property taxes; (3) the over $500.00 in

utilities he pays monthly for said home; and (4) his wife's career as a reporter for

Telemundo Denver.  (Docket Nos. 35 and 41, Exhibits 2, 3, 5, 8, 9, 11, 15, 17-22, 24, and

25).

       Conversely, Defendant's ties in Puerto Rico consist of: (1) a practice located at an

office space in San Juan, Puerto Rico, that he rents from a fellow colleague for one dollar

($1.00) a year; (2) medical privileges at Ashford Hospital in San Juan, Puerto Rico; (3)

social and familial ties in Puerto Rico; (4) a Puerto Rico postal address; (5) a Puerto Rico

phone number; (6) an apartment in the Condado area in San Juan; (7) a 2006 Jeep

Wrangler that he uses when he visits the island; (8) property and income taxes he files as

a Puerto Rico resident; among a few other ties.  (Docket Nos. 35 and 41, Exhibits 2, 3, 5-

7, 9-12, 14, 15, 21, and 24).

       At first glance, it may seem that Defendant's domicile possibly remains in Puerto

Rico.  However, the details and comparison of Defendant's ties to both places convince

the Court that his true domicile is in Oklahoma.

For instance, Defendant claims he moved to Oklahoma for business opportunities, but insists that his domicile and principal place of business is and remains in Puerto Rico. He also alleges that surrendering his Puerto Rico driver's license and acquiring an Oklahoma license was done for the same reasons.  Nonetheless, from the exhibits attached to Plaintiff's Opposition,[5] it is clear that Defendant spends more time doing business in Oklahoma than he does in the island.  For example, the exhibits show that he has conducted almost twice as many surgeries in Oklahoma than he has in Puerto Rico since 2019.  Defendant also lists his Oklahoma medical practice as his main business address on his webpage.

Moreover, Defendant fails to mention that, as part of his Chapter 11 Bankruptcy Reorganization Plan currently underway in Puerto Rico, the Condado apartment Defendant claims as his main home is part of the Bankruptcy estate to settle his debts.  In the same vein, the two luxury cars he leased in Puerto Rico were also repossessed shortly after purchasing those he currently owns in Oklahoma.  The only car he currently owns in Puerto Rico is a 2006 Jeep Wrangler.  On the other hand, and despite the occasional visits to the island, Defendant spends most of his personal time in his 6-bedroom Oklahoma mansion with his wife and pets.  The electrical bill consumption exhibits show that Defendant consumed way over twice the amount of electricity in his Oklahoma home than he did in his Condado apartment during the time surrounding the filing of the Complaint. The bank statements, provided as part of Plaintiff's exhibits, likewise show that the bulk of the transaction activity is in Oklahoma and neighboring states, whereas transactions

---

[5] See Docket No. 41, Exhibits 1-27.

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 10

_____

done in Puerto Rico are fewer and farther between. Furthermore, because Defendant was

living in Oklahoma at the time, he chose to both register and vote in the last presidential

elections in that state, yet he did not vote in Puerto Rico.[6]

As Plaintiff contends in his opposition, Defendant's numerous ties to Oklahoma

far outweigh what remaining ties he has in Puerto Rico.  Defendant seemingly urges the

Court to take his "verified and uncontested statement" as the "ultimate evidence" of his

intent to have Puerto Rico be his true domicile but provides no other documentary

evidence to support his position.   However, this Court has previously held that

"'[s]tatements of intent are accorded minimal weight [when] measured against [other]

objective factors.'"  Padilla-Mangual v. Pavia Hosp., 640 F.Supp. 2d 128, 137 (D.P.R.

2009) (Besosa, J.) (citing Alicea-Rivera v. SIMED, 12 F.Supp.2d 243, 246 (D.P.R. 1993)).

Hence, Defendant's steadfast conviction, without more, cannot be taken merely on blind

faith.

In sum, Plaintiff has demonstrated by a preponderance of the evidence, that

Defendant is indeed domiciled in Oklahoma, therefore proving that diversity jurisdiction

exists.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(1) is DENIED.  (Docket No. 35).

_____

[6] The Court recognizes that the COVID-19 Pandemic restrictions made travel almost impossible during 2020, on an
international level. However, Defendant had the option of voting in the Puerto Rico elections via mail-in ballots, for
example.

Juan C. Rivera Pedrogo v. Dr. Fernando L. Villamil Wiscovitch
Opinion and Order
Civil No. 22-1039 (CVR)
Page 11

_____

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 21st day of March 2023.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE

**EXHIBIT 8**

SI-0634 (GV)
21-18157 M/G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN C. RIVERA PEDROGO        *
                                *
                                *
Plaintiff                     *
                                *     CIVIL NO: 22-cv-1039(CVR)
vs.                         *
                                *
DR. FERNANDO L. VILLAMIL    *
WISCOVITCH                 *
ET AL                        *
                                *
Defendants                  *
* * * * * * * * * * * * * * *

<u>**MOTION REQUESTING AUTOMATIC STAY OF THE CASE**</u>

TO THE HONORABLE COURT:

     Comes now, Dr. Fernando L. Villamil Wiscovitch through his undersigned attorney, and to this Honorable Court respectfully alleges and prays:

     1.    That plaintiff filed Bankruptcy Case Number 19-06327-BKT on **October 30, 2019.** See Exhibit 1.

     2.    That paragraph 6.3 of the Complaint in this case states in part as follows: " The statute of limitations applicable to the instant case was interrupted **by the filing of a lawsuit on October 28, 2019,** at the Court of First Instance of Puerto Rico, San Juan Part, in the Civil Case No. SJ2019CV11363......."

     3.    That since the Bankruptcy Case was filed by Fernando L. Villamil Wiscovitch on October 30, 2009, after plaintiff's Rivera

Pedrogo Complaint of October 28, 2019, the Bankruptcy filed by Dr. Fernando L. Villamil Wiscovitch covers this case which must be automatically stayed.

WHEREFORE, appearing codefendant respectfully requests from this Honorable Court that the present case be automatically stayed.

I CERTIFY: That on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record, including the following: José F. Velázquez Ortiz, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

In San Juan, P.R., May 11, 2023.

BUFETE GONZÁLEZ VILLAMIL
GONZÁLEZ PANDO PLAZA
1181 AVE. JESÚS T. PIÑERO
SAN JUAN, PR  00920-5604
TELS: 792-5200; 273-8223
FAX: 273-8250
jose@gonzalezvillamil.com


s/Jose A. González Villamil
JOSE A. GONZALEZ VILLAMIL
USDCN  127105